Leo J. ROMERO and James F. Lane, and all others similarly situated,
Plaintiffs,

v.

Hilbert SCHAUER, Director of Colorado Department of Institutions, et al.,
Defendants.

Civ. A. No. C–5366.

United States District Court,
D. Colorado.

Nov. 14, 1974.

Robert Tabor Booms, Denver, Colo., Joe T. Ulibarri, Pueblo, Colo., and Paul Baca, Denver, Colo., for plaintiffs.

Patricia W. Robb, Asst. Atty. Gen., Pueblo, Colo., and James R. Martin,

Asst. Atty. Gen., Denver, Colo., for defendants.

Before McWILLIAMS, Circuit Judge, ARRAJ and WINNER, District Judges.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This is a 42 U.S.C. § 1983 class action brought by two patients of the Colorado State Hospital who were transferred to the state penitentiary under C.R.S. (1963), § 71–2–4(3) after an administrative determination that they were too dangerous for continued confinement in the Hospital. Plaintiff Lane was committed to the State Hospital in 1955 as the result of a civil proceeding. Plaintiff Lloyd S. Lontine was committed after being found not guilty of a criminal charge by reason of insanity. During the pendency of this action, Lontine was killed at the state penitentiary by an inmate, and the parties stipulated that Leo J. Romero be substituted as a named plaintiff. Romero is also a criminal commitment. The plaintiffs challenge the constitutionality of § 71–2–4(3), the procedure by which the determination is made to transfer patients from the hospital to the penitentiary, and their continued confinement there. A three-judge court was convened pursuant to the mandate of 28 U.S.C. § 2281.

The class represented by the plaintiffs is composed of "all persons adjudicated insane, committed by the Court to the Colorado State Hospital for care and treatment, and thereafter transferred and kept by the defendants at the Colorado State Penitentiary under color of state law." [1] Named as defendants are the Director of the Colorado Department of Institutions, the Superintendent of the Colorado State Hospital, and the Warden of the Colorado State Penitentiary.

The plaintiffs ask that the Court permanently enjoin enforcement of the transfer statute, enter a declaratory judgment that transfer to, and continued confinement in the state penitentiary violate their Fifth, Sixth, Eighth and Fourteenth Amendment rights, and maintain continuing jurisdiction of the case.

The complaint contains four claims for relief and the substance of each of the claims is as follows.

The first claim alleges that the statute authorizing the transfer of members of the plaintiff class from the hospital to the penitentiary and authoriz-

---

1. The plaintiffs also challenge the constitutionality of subsection (4) of C.R.S. (1963), § 71–2–4, as amended (Supp.1967). That subsection provides:

(4) Whenever it is reported to the director of the department of institutions by the warden and certified to by the prison physician that any mentally ill or retarded person who, having been transferred from an institution for the care and treatment of mentally ill or retarded persons, under the supervision of said director, to the Colorado state penitentiary for safekeeping, can be cared for better at an institution for the care and treatment of the mentally ill or retarded, said director may order such mentally ill or retarded person transferred to an institution for the care and treatment of mentally ill or retarded persons, under his supervision. The expense of transferring said mentally ill or retarded person to and from, and maintaining him in the Colorado state penitentiary shall be paid out of any money appropriated for the maintenance of the institution under the supervision of said director in which said mentally ill or retarded person was present most recently prior to his transfer to the Colorado state penitentiary.

The plaintiffs have neither alleged nor offered evidence of either the certification contemplated by the statute or bad faith refusal to certify. Nor have they alleged that they are not dangerous or are sane. Therefore, we have concluded that the constitutionality of the subsection is challenged only insofar as it permits continued confinement in the penitentiary after a transfer accomplished without the guarantees of procedural due process (discussed *infra*) or only insofar as it gives color of law to continued confinement in the penitentiary without psychiatric treatment. Thus, the constitutionality of subsection (4) is questioned obliquely if at all. With the challenge to the subsection in this posture, we prefer to rest our decision squarely on the due process and equal protection claims explicitly presented.

ing their continued confinement there without a judicial determination of criminal guilt constitutes cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments.

Secondly, it is contended the incarceration at the penitentiary works a de facto reclassification of the plaintiffs from mental patients to criminals, denying them equal protection of law.

It is alleged in the third claim that the procedures utilized in determining the extent to which the plaintiffs are dangerous deny them due process of law.

Finally, it is contended that the challenged statute is unconstitutional on its face because it provides no procedural safeguards to the transferee and amounts to a delegation of judicial power (to punish misbehaving patients as criminals) to the executive branch of government in violation of Article III of the Colorado Constitution.

Because of the result that we eventually reach, the due process claim will be dealt with first.

I

Due Process

The statute providing for transfer of patients from the State Hospital to the penitentiary provides:

71–2–4. Transfer of insane and convicts.—

\*     \*     \*     \*     \*     \*

(3) The director of the department of institutions is further empowered, when it is reported to him that any mentally ill or retarded person is so dangerous that he cannot be safely confined in any institution for the care and treatment of the mentally ill or retarded under his supervision, to order said mentally ill or retarded person transferred to the Colorado state penitentiary for safekeeping.

Although the pleadings have not addressed the constitutionality of the new criminal transfer statute,[2] the procedures followed in making the decisions to transfer a criminally committed patient are identical to those utilized with the civilly committed. Therefore, although the criminal transfer statute has not been challenged explicitly, our decision on the constitutionality of the procedures employed under § 71–2–4(3) reflects our view as to the constitutionality of the criminal transfer procedures.[3]

Defendants urge that Pigg v. Patterson, 370 F.2d 101 (10th Cir. 1966) must control our decision on the due process question. To be sure, that case held that the transfer statute in effect at the time, identical in all material respects to the present § 71–2–4(3), worked no denial of due process.[4] The basis for the holding seems to have been that no cognizable "liberty" interest of the patient was affected by the transfer. Recent decisions of the Supreme Court on the question of the due process rights of those whose liberty is only conditional or already restricted by institutionalization, particularly Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), convince us that the Pigg decision on the constitutional question would now, in a proper case, be modified.

In Wolff the Supreme Court recognized that a prison inmate's earned "good time credit" was encompassed within the "liberty" protected by the

2. See note 26, infra.

3. The state seems to concede the fact that there is no constitutionally permissible justification for affording criminally committed patients fewer procedural safeguards than those civilly committed. See Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

4. The section at that time provided:

"The governor is further empowered, with the approval of the public institutional advisory board, when it is reported to him by the superintendent of the Colorado state hospital that any mentally ill person is so dangerous that he cannot be safely confined in said Colorado state hospital, to order said mentally ill person transferred to the Colorado state penitentiary for safekeeping."

Fourteenth Amendment and held that it could not be revoked by the state for violation of a prison rule without affording the minimum due process protections "appropriate under the circumstances." Of special significance is footnote 19 of the opinion which indicates that the test to be used in deciding whether institutional action will affect the liberty of the inmate is whether the action may result in a "major change in the conditions of confinement." We perceive no distinction between prison inmates and institutionalized mental patients which would suggest a different test in our case. Just as the inmates of a prison do not forfeit all constitutional rights upon commitment, neither do the patients at the Colorado State Hospital, although those rights retained may be somewhat restricted by the nature of the institutional environment. *Cf.* Wolff v. McDonnell, *supra.*

■ We conclude that the actions of the state in determining whether a patient is "so dangerous that he cannot be safely confined in [the Colorado State Hospital]" and that he "should be transferred to the Colorado state penitentiary for safekeeping" may work a major change in the conditions of confinement and, therefore, affect the liberty of the patient protected by the Due Process Clause of the Fourteenth Amendment. This conclusion is grounded on the following findings:

1.  Patients transferred from the state hospital to the penitentiary are ordinarily housed in the maximum security facility, and are not segregated from prison inmates being held in that facility.

2.  The maximum security environment at the penitentiary is highly restrictive and is a penal environment.

3.  While housed at the state penitentiary, the patients are subject to all rules and regulations of the penitentiary, rather than the rules and regulations of the state hospital.

4.  The physical environment of the maximum security facility at the penitentiary is much less conducive to therapy and psychiatric treatment than that of the maximum security facility at the state hospital.

5.  Patient access to treatment personnel has heretofore been much more limited at the penitentiary than at the state hospital.

6.  Psychiatric treatment actually provided to patients housed at the penitentiary is substantially inferior, both in quantity and quality, to that provided patients confined at the state hospital.[5]

It appears that the following procedure is now followed at the state hospital to determine whether a patient is so dangerous as to require transfer to the penitentiary:

When there is cause to believe an inmate is "dangerous" (usually, if not always, as the result of an incident of violent or assaultive behavior), a recommendation may be made by any one of four key administrative-treatment personnel that the patient be transferred to the penitentiary.[6] A five-man ad hoc committee is then convened to make a recommendation to the Superintendent of the hospital. The committee solicits recommendations on transfer from the staff of the hospital and interviews the patient prior to making its final recommendation. This final committee recommendation "should be reduced to writing" but "can be made verbally." The

---

5.  These findings are based on testimony as to the differences between the maximum security facility of the hospital and the maximum security facility of the penitentiary. The differences between the medium security unit at the hospital and the maximum security unit at the penitentiary are even more striking.

6.  This recommendation was likened to an indictment by the former Division Director of the hospital's Forensic Psychiatry Unit. (Transcript, at 102). In the past, some such initial recommendations have come from the hospital security police, rather than from administrative or treatment personnel.

procedure is informal. While the hospital staff would allow the patient to have an attorney present at the "interview" with the patient, the patients have not been so advised. A "summarized report" of the proceedings is prepared, but no transcript or detailed minutes are kept. Precisely what is "summarized" is unclear. The evidence did not disclose whether formal findings are made at the hearing or whether the patient is furnished with a copy of the recommendation and summarized report.

The above procedures were formalized in an emergency transfer directive, adopted in March, 1974.[7] They constitute a laudable first step toward insuring against an arbitrary transfer decision, but they do not measure up to the requirements of due process.

■ What process is constitutionally due is a function of "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Accord, Wolff v. McDonnell, supra; Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Cf. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The extent to which procedural due process must be afforded [the patient] is influenced by the extent to which he may be "condemned to suffer grievous loss," Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 627, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and depends upon whether the [patient's] interest in avoiding that loss outweighs the governmental interest in summary adjudication. Goldberg v. Kelly, supra at 262–

---

7. That directive reads as follows:

EMERGENCY TRANSFER OF A COLORADO STATE HOSPITAL PATIENT TO COLORADO STATE PENITENTIARY FOR SAFEKEEPING

In extreme circumstances, a patient may be considered for transfer to Colorado State Penitentiary for safekeeping. The statutory authorization for this will be found in Colorado Revised Statutes 39–8–105(4) in the case of a criminally committed patient, and 71–2–4(3) in the case of a non-criminally committed patient. Basic criteria for a transfer of this nature are two: (1) Because of high escape risk or extreme danger to himself or others, the patient is presently incapable of living in a ward setting; (2) If allowed to remain in Colorado State Hospital, the patient would be in serious and imminent danger of being assaulted.

The process of transfer will be initiated by a recommendation that a specific patient meets the above criteria and should be transferred to CSP. This recommendation can be made by the Track Chief, the Division Director, the Executive Assistant to the Superintendent, or the Superintendent. When this recommendation is made by any one or more of these four people, the patient is to be placed immediately in restraint and seclusion. If he is considered to be in danger on his ward, he may be transferred to another ward by the appropriate authorities.

On the first working day after the recommendation has been made or on the same day if possible, the patient is to be staffed for group consideration of the possibility of sending him to CSP. The Ad Hoc Committee is to be chaired by the Executive Assistant to the Superintendent (or, in his absence, the Assistant Superintendent) and will consist of the Division Director, the Division Chief Psychiatrist, the Track Chief, and the Track Psychiatrist. Recommendations concerning the patient's transfer will be solicited from the Hospital Police Chief, ward staff, Area Managers, supervisors, and others as desired by the Executive Assistant to the Superintendent. The five-man special Ad Hoc Committee will interview the patient, receive recommendations, and make their recommendations to the Superintendent who will make the final decision. Although these recommendations can be made verbally, they should be reduced to writing for the record. If the final recommendation of the Superintendent is that the patient be moved to the Colorado State Penitentiary, the Division Director will initiate the details of the move such as arranging for transportation by the Hospital Police, calling the Colorado State Penitentiary, and seeing to it that the appropriate paperwork is done. The Executive Assistant to the Superintendent will obtain verbal approval of the transfer for safekeeping from the office of the Executive Director of the Department of Institutions.

[The procedures outlined in the above directive were formulated and adopted by the hospital administration without consultation with or advice from the Colorado Attorney General's office.]

263, 90 S.Ct. at 1017; Wolff v. McDonnell, *supra;* Morrissey v. Brewer, *supra.*

The accusation that a patient is "so dangerous that he cannot be safely confined" in the state hospital is not a criminal charge, even if premised on some overt act of violence.[8] A proceeding at which the dangerousness issue is determined is not a criminal proceeding and the full panoply of rights due a criminal defendant is not required. *Cf.* Wolff v. McDonnell, *supra;* Morrissey v. Brewer, *supra.* Nor is the liberty of the patient affected by the transfer decision the same in nature as the liberty of one whose parole[9] or probation[10] is revoked. It is quantitatively and qualitatively different from all of these, and is more akin to the prisoner's liberty involved in revocation of "good time credit," the situation in Wolff v. McDonnell, *supra.* To be sure the impact of the decision to transfer the patient to the penitentiary is much more immediate than that of the decision to revoke good time credit. The liberty denied by incarceration in the penitentiary cannot be restored at some later time as could the good time credit withdrawn by the state in *Wolff.* Transfer is certain to be swift and certification for transfer back to the hospital will not erase the retardation of the patient's treatment and recovery which must flow from any substantial period of confinement in the penitentiary.[11] Accordingly, the patient's liberty interest falls somewhere between the immediate deprivation of conditional liberty attending parole or probation revocation and the deferred and uncertain eventual impact of a decision to revoke the good time credit of one already incarcerated in a penal institution.[12]

The state's interest in the content and structure of the transfer procedure is not insubstantial, however. In *Wolff,* the court viewed this "stake" as "the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators . . . ," 94 S.Ct. at 2977. Institutional security and patient safety may be threatened, for instance, by a procedure which includes mandatory disclosure, confrontation and cross-examination of adverse witnesses.[13] We perceive the interest of the state in the structure and content of the transfer procedure to be substantially the same as its interest in a prison disciplinary procedure, at least where the transfer recommendation is premised upon an accusation of violent or assaultive behavior.

In light of the nature of this state interest, we are not persuaded that the more immediate impact of the decision to transfer a patient from the hospital to the penitentiary requires substantial departure from the procedures held to be the minimum required by due process in *Wolff.*

---

8. It appears that a recommendation to transfer could be precipitated by something short of an act of violence. Psychological testing, for instance, might reveal a personality trait which would lead the staff to reconsider the advisability of the continued presence of the patient in the hospital. Neither the statute nor the hospital's policy (*see* note 7, *supra*) limit the basis of the recommendation to violent or dangerous acts. But in either case, the recommendation must have some factual premise. The ultimate determination to be made, viz., whether the patient is "so dangerous that he cannot be safely confined" in the state hospital and should be transferred to the penitentiary involves an element of discretion and clinical judgment, but there must be facts upon which that judgment may be made.

9. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

10. Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

11. The plaintiffs' expert in clinical psychology testified that patients incarcerated in the penitentiary "must be damaged there." (Transcript, at 86).

12. "For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty." Wolff v. McDonnell, *supra* at 2977.

13. *See* discussion in *Wolff, supra* at 2979–2981.

■ We hold that the Due Process Clause of the Fourteenth Amendment requires that a state hospital patient proposed for transfer to the penitentiary because he is "so dangerous that he cannot be safely confined" in the hospital, must be provided:

(a) written notice of the facts upon which the accusation of dangerousness is based, sufficiently detailed to allow him or his attorney opportunity to marshal facts in his defense;

(b) a hearing before an impartial hearing body;

(c) opportunity to call witnesses and present documentary evidence in his own behalf when permitting him to do so will not be unduly hazardous to institutional security or safety;

(d) a written statement by the hearing body as to the evidence relied on and the reasons for its ultimate decision on the patient's dangerousness and recommendation on transfer.

All of the above were recognized [14] in *Wolff* as the minimum required by due process in that particular prison disciplinary setting. We adhere to the parameters of those rights as explained in that decision.

Similarly, we hold that due process does not require disclosure, confrontation or opportunity to cross-examine adverse witnesses, Wolff v. McDonnell, *supra,* although in cases where such would not threaten institutional interests the state may, in its discretion, make available the procedures. Neither does due process require that the hearing in all cases *precede* restraint or even transfer, *cf.* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); however, if transfer is effected before hearing, the hearing should be held within a reasonable time after such transfer.

■ The factual situation in this case is sufficiently different from *Wolff,* however, that due process requires that the patient be allowed to retain legal counsel, if financially able, or if he is indigent, he should be provided with counsel.[15] The Supreme Court in *Wolff* although declining to hold that there was a right to counsel in a prison disciplinary setting, based its decision in large part upon Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed. 2d 656 (1973). But, the Court remarked,

Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently com-

14. The right to an impartial hearing body was recognized implicitly at 2982. There was no testimony in the case before us to indicate that the ad hoc committee referred to would not be sufficiently neutral to satisfy the requirement of an impartial hearing body so long as the person whose initial recommendation triggers the transfer proceeding does not sit on the committee during the hearing. *Cf.* Morrissey v. Brewer, *supra.*

15. It was pointed out by the Assistant Attorney General at the final argument in this matter that the state employs an attorney who is available to the patients for assistance with their legal problems of a civil nature. Apparently, this attorney has also assisted pa-tients in habeas corpus and civil rights matters. On the basis of the facts thus represented, it appears that this attorney is the ideal candidate where appointment of counsel is required. In light of the testimony of the state's witnesses that upon completion of the hospital's new maximum security facility the need to consider transfers to the penitentiary will be in large part obviated by the increased ability to deal with the dangerous patient at the hospital, we do not view the administrative or financial burden placed on the state by this decision as significant. In this connection, it should also be noted that only two "dangerous" patients remain at the penitentiary at present.

petent inmate designated by the staff. 94 S.Ct. at 2982.

And in *Scarpelli* the Court did not hold that due process requirements could be satisfied in all cases of probation revocation without providing counsel. Instead, the Court suggested a case-by-case approach, noting that

> In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. 411 U.S. at 790–791, 93 S.Ct. at 1764.

■ One who has been adjudicated insane cannot be presumed competent to grapple with the complex issue of his "dangerousness" involving as it must, questions of fact and psychiatric prediction. The presumption must be to the contrary.

Finally we note that C.R.S. § 71–2–4(3) [16] limits the state's discretion to transfer a patient to the penitentiary to instances in which it is "reported" that he is "so dangerous that he cannot be safely confined" in the state hospital. We have held that the patient is entitled to a decision on this issue. The transfer policy directive [17] and the new transfer statute applicable to the criminally committed [18] appear to authorize penitentiary transfers in a wider range of situations than § 71–2–4(3). This latter statute provides for involuntary transfer of only those patients who have been determined to be "dangerous." It does not sanction the broader range of criteria embodied in the policy directive. The Colorado Supreme Court has declared:

> Imprisonment in the penitentiary is unlawful unless expressly provided by statute. Bustamante v. People, 133 Colo. 497, 501–502, 297 P.2d 538 (1956).

The transfer statute challenged here authorizes involuntary transfer of the "dangerous," not the non-dangerous high escape risk or the patient allegedly in danger from others. As a matter of state law, the transfers of those civilly committed are invalid if premised on criteria other than the "dangerousness" of the individual.[19] And the statute requires not only that he be found "dangerous," but that he also be "so dangerous that he cannot be safely confined" in the hospital. Only if the extent of the danger posed is also considered by the committee, may transfer be authorized.

## II

### Equal Protection

It is alleged that transfer to and confinement in the state penitentiary deny the transferee patient equal protection of the laws in three respects. First, in the absence of procedural safeguards, the classification of a patient as so dangerous that he cannot be safely confined in the state hospital is arbitrary and capricious; second, the classification of a patient as dangerous to the degree required by the transfer statute bears no rational relationship to the qualitative disparity in psychiatric treatment provided patients housed in the penitentiary and the hospital; and, third, the classification and resulting confinement in the penitentiary affect "fundamental interests," but have not been proven necessary to further a compelling state interest.

Our decision on the due process questions presented assures fundamental fairness in the classification procedure, and we need not consider further the first alleged equal protection denial.

■■ The equal protection approach employed by the Supreme Court has

16. *See* 386 F.Supp. 853, *supra.*

17. *See* note 7, *supra.*

18. *See* note 26, *infra.*

19. It is highly doubtful whether more permissive criteria could be provided by statute for transfer of the criminally committed. *See* Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

been amply analyzed elsewhere [20] and does not necessitate further explanation here. It is sufficient to restate that equal protection denials fall into one of two "tiers" of scrutiny.[21] Classifications which are "suspect" or which affect "fundamental interests" are strictly scrutinized and the state must prove that they are necessary to the furtherance of a compelling state interest. Classifications affecting interests which are not "fundamental" must bear only a rational relationship to a legitimate state purpose.[22]

At present, the classification of a patient as "so dangerous that he cannot be safely confined" in the state hospital carries with it two consequences. The patient is transferred to the penitentiary for safekeeping and is provided psychiatric treatment for his illness which is substantially inferior to that accorded less dangerous patients who remain at the hospital.

Plaintiffs assert this transfer and confinement infringe two fundamental interests of the patient, his "right" to be confined in the hospital rather than in the penitentiary and his right to psychiatric treatment. We need not decide whether either of these alleged interests of the patient is "fundamental" for equal protection analysis.[23]

■ The state has demonstrated that it may infringe the "right" to remain in the hospital, even under the strict scrutiny test. The determination which must be made prior to transfer is that the patient is sufficiently dangerous that he cannot be safely confined, even in the maximum security ward, in the state hospital. Thus, prior to transfer, the state itself makes the determination that the infringement on the patient's interest in remaining at the hospital is necessary to promote the compelling state interest in protecting other patients and staff from the dangerous patient. The statute draws a perfect classification and the plaintiffs have not contended that in practice it is drawn less perfectly. Cf. Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). Therefore, transfer and confinement in the penitentiary, in and of themselves, work no denial of equal protection even when subjected to strict scrutiny.[24]

■ However, the State of Colorado by statute explicitly guarantees a right to psychiatric treatment to all persons committed to the state hospital, whether the commitment is the result of a civil proceeding [25] or of a verdict of not guilty by reason of insanity in a crim-

---

20. E. g., Gunther, The Supreme Court 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972).

21. But see, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 70, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting opinion).

22. See, e. g., San Antonio Independent School District v. Rodriguez, supra.

23. There is no allegation that a "suspect" classification is involved in this case, the other triggering device for strict scrutiny of the statute. See, e. g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage).

24. We note that upon completion of the new maximum security facility at the state hos-

pital, the evidence indicates that far fewer transfers would be necessary to promote the state's interest in protecting other patients and staff. Only in a case where such a transfer was not necessary would we have to reach the question of whether the patient has a fundamental interest in remaining at the hospital. The new maximum security facility will give the state much greater capability to safely confine the dangerous patient in the hospital.

25. Colo.Sess.Laws (1973) ch. 227, § 1, p. 827 and intended to be designated as, C.R.S. (1973), § 71–1–16, provides:
71–1–16. Right to treatment. (1) Any person receiving evaluation or treatment under any provisions of this article [the Colorado civil commitment statutory scheme] is entitled to medical and psychiatric care and treatment . . . ." [emphasis ours].

inal case.[26] The right is not one enjoyed only by the non-dangerous patient and is not conditioned on the ultimate place of institutionalization. Because the psychiatric treatment provided patients housed in the penitentiary is substantially inferior to that provided patients in the state hospital, in both quantity and quality, we must agree with the plaintiffs that patients confined in the state penitentiary are denied equal protection of the laws.

■ Although the dangerousness of the patient (determined in accordance with the requirements of due process specified, *supra*, in section I of this opinion) may justify his transfer to and incarceration in the penitentiary even when subjected to strict scrutiny, the classification does not provide even a rational basis for the inferior psychiatric treatment provided the dangerous patients who are confined in the penitentiary. It may well be that a dangerous patient as a matter of medical judgment, should receive a mode of psychiatric treatment different from that given the non-dangerous. That is a question upon which we cannot speculate. But there is apparently no particular relationship between dangerousness and "treatability," or between dangerousness and other factors upon which the state could premise the denial of substantially equivalent psychiatric care suffered by its transferee patients. Thus we conclude that the disparity in psychiatric treatment is not rationally related to the dangerous—non-dangerous classification and denies the plaintiff class equal protection of the laws.

Having decided that the state must provide patients confined in the penitentiary with psychiatric treatment substantially equivalent to that provided patients at the state hospital, we need not decide whether penitentiary confinement without such treatment also constitutes cruel and unusual punishment.

III

The State Constitutional Claim

■ We find no merit in plaintiffs' claim that the challenged statute constitutes an unlawful delegation of the power to inflict criminal punishment to the executive branch of the state. The accusation that a patient is dangerous is not a criminal charge as noted previously. There was no evidence that patients are transferred from the hospital to the penitentiary to punish violent behavior. Nor does the authorizing statute permit transfer as punishment for dangerousness or for a violent act. In the absence of proof that such has been the practice, we hold that the statute is not violative of Article III of the Colorado Constitution.

IV

Conclusion

The procedures heretofore utilized in determining whether a patient committed to the Colorado State Hospital is "so dangerous that he cannot be safely confined" in that institution and should be transferred to the Colorado State Penitentiary for safekeeping deny the plaintiff class due process of law.

Confinement of members of the plaintiff class in the state penitentiary with-

26. Colo.Sess.Laws (1972) ch. 44, § 1, p. 227 *and intended to be designated as*, C.R.S. (1973), § 39–8–105(4) provides:
39–8–105. Procedure after plea.
   *    *    *    *    *
(4) If the trier of fact finds the defendant not guilty by reason of insanity, the court shall commit the defendant to the custody of the department of institutions until such time as he may be found eligible for release. The executive director of the department of institutions shall designate the state facility at which the defendant shall be held *for care and psychiatric treatment*, and may, from time to time, transfer the defendant from one institution to another whenever in the opinion of the director it is desirable to do so in the interest of the proper care, custody, and treatment of the defendant or the protection of the public or the personnel of the facilities in question [emphasis ours].

out psychiatric treatment substantially equivalent to that provided patients at the Colorado State Hospital denies them equal protection of the laws.

Wherefore, it is ordered:

That no patient may be involuntarily transferred to the penitentiary except upon a finding that he is so dangerous that he cannot be safely confined in the state hospital;

That the state provide the patient alleged to be so dangerous:

(a) written notice of the facts upon which the accusation of dangerousness is based;

(b) a hearing on the issue of his dangerousness before an impartial hearing body prior to transfer; however, if an emergency transfer for safety or security reasons is effected before a hearing can be had, the hearing must be held within a reasonable time after such transfer;

(c) an opportunity to call witnesses and present evidence in his own behalf when permitting him to do so will not be unduly hazardous to institutional security or safety;

(d) a written statement by the hearing body as to the evidence relied on and the reasons for any finding that he is "so dangerous that he cannot be safely confined" in the state hospital and is recommended for transfer to the penitentiary;

(e) assistance of legal counsel provided by the state if the patient is indigent, and the opportunity for assistance of legal counsel retained by the patient if he is not indigent.

That the state provide patients transferred to the state penitentiary with psychiatric care and treatment substantially equivalent to that provided patients confined at the state hospital.

That within a reasonable time from this date, not to exceed forty-five days, the state provide opportunity for the hearing required by due process to those two members of the plaintiff class who remain incarcerated in the state penitentiary.