******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FRANCIS ANDERSON
(SC 19399)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued January 15—officially released November 3, 2015*

*Monte P. Radler*, public defender, with whom was *Cynthia Love*, assistant public defender, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney, with whom, on the brief, were *Peter A. McShane*, state's attorney, *Jeffrey Doskos*, senior assistant state's attorney, and *Alanna D. Tynan*, deputy assistant state's attorney, for the appellee (state).

*Nancy B. Alisberg* filed a brief for the Office of Protection and Advocacy for Persons with Disabilities as amicus curiae.

*Proloy K. Das* filed a brief for the National Crime Victim Law Institute as amicus curiae.

*Opinion*

ZARELLA, J. This case raises the questions of whether a trial court may set a monetary bond as a condition of release when an insanity acquittee is charged with committing new, violent crimes while housed at a maximum security psychiatric facility and, if the acquittee cannot post that bond, whether he may be held in the custody of the Commissioner of Correction at a prison while awaiting trial on the new charges. After concluding that this matter presented issues of substantial public interest and that further delay may work a substantial injustice, the Chief Justice granted the request of the defendant, Francis Anderson, to file an expedited, interlocutory appeal pursuant to General Statutes § 52-265a.[1] The defendant thereafter appealed from the trial court's order requiring, as a pretrial condition of his release, that he post a $100,000 cash or surety bond. He claims that, under the circumstances of this case, the trial court's imposition of a monetary bond and, after he was unable to post that bond, his subsequent transfer to the custody of the Commissioner of Correction, amounted to violations of his constitutional rights to (1) bail, pursuant to article first, § 8, of the constitution of Connecticut,[2] and (2) procedural due process, pursuant to the fourteenth amendment to the United States constitution.[3] We disagree with each of the defendant's claims and, accordingly, affirm the trial court's order setting a monetary bond as a condition of his release.

The following undisputed facts and procedural history are relevant to this appeal. The defendant, who is forty-six years old, has an extensive history of psychiatric problems and involvement with the criminal justice system. He has spent much of his adult life either incarcerated or in other institutionalized settings.[4] Following an incident that occurred on or about July 6, 2012, the defendant was charged with assault of a correction officer, breach of the peace and failure to submit to fingerprinting.[5] The defendant subsequently was found not guilty of these charges by reason of mental disease or defect.[6] On August 15, 2013, the trial court, *McMahon, J.*, committed the defendant to the custody of the Commissioner of Mental Health and Addiction Services. The defendant was transferred to the Whiting Forensic Division of Connecticut Valley Hospital (hospital), where he received a psychiatric evaluation pursuant to General Statutes § 17a-582.[7] The October 23, 2013 report resulting from that evaluation recommended that the defendant be returned to prison. On November 18, 2013, Judge McMahon disagreed with the hospital's recommendation and, consistent with the contrary recommendation of an independent evaluator sought by the defendant pursuant to § 17a-582 (c),[8] ordered that the defendant be committed to the custody of the Psychiatric Security Review Board (board) and confined at the

hospital for a period not exceeding ten years.[9] On February 7, 2014, the board held the defendant's initial commitment hearing, after which it concluded that he had a psychiatric illness that required care, custody and treatment. It concluded further that he had a psychiatric disability to the extent that his discharge would constitute a danger to himself or others, and that he required confinement in a maximum security setting. Accordingly, the board ordered that the defendant remain confined at the hospital under maximum security conditions.[10]

Upon arriving at the hospital, the defendant allegedly commenced a pattern of assaulting other patients and hospital staff. As a result of his conduct on various dates from October, 2013, through February, 2014, he was charged with several misdemeanors.[11] Thereafter, in April, 2014, he was charged with, inter alia, two counts of assault of health-care personnel, a class C felony. See General Statutes § 53a-167c. In connection with all but one of these charges, the defendant was released on a promise to appear and ordered returned to the hospital.[12] Also, in April, 2014, the state filed a motion for bond review, in which it requested that the trial court modify the defendant's existing conditions of release and impose an "appropriate" monetary bond. The defendant filed an opposition to the state's motion and an accompanying memorandum of law, arguing therein that the court lacked the authority to impose a monetary bond under the circumstances of this case. The parties attached exhibits to these filings, including the hospital's October 23, 2013 report concerning its psychiatric evaluation of the defendant, several reports from the defendant's independent psychiatric evaluator, the transcript of the commitment hearing before the board and the board's report recommending that the defendant be confined in a maximum security setting.

On June 18, 2014, the trial court, *Gold, J.*,[13] concluded that, although the defendant was a confined insanity acquittee, the court retained the authority, conferred by General Statutes § 54-64a[14] and Practice Book § 38-4,[15] to set a monetary bond upon his commission of new offenses in the hospital setting, particularly for the purpose of ensuring the safety of other persons. The court then scheduled an evidentiary hearing on the state's motion for bond review to consider whether the defendant's existing conditions of release should be modified. Before that hearing could occur, however, the defendant was charged with another felony count of assault of health-care personnel, as well as three additional misdemeanors. On August 25, 2014, at the defendant's arraignment on those charges, the court set a bond in the amount of $100,000, cash or surety. Because the defendant was unable to post that bond, he was transferred to the custody of the Commissioner of Correction.[16] See General Statutes § 54-64a (d). The court directed that the mittimus reflect that the defen-

dant required mental health treatment and that he should be housed and monitored in a way to ensure, to the extent possible, the safety of other inmates and correction personnel. The defendant's appeal to this court, pursuant to certification by the Chief Justice, ultimately followed.[17]

At a subsequent hearing to address the defendant's motion for stay of the trial court's order setting a monetary bond pending disposition of this appeal,[18] the court elaborated on its reasons for that order. It reiterated its belief that it "retain[ed] the inherent authority to set bond and to establish conditions of release, including financial conditions, even as to insanity acquittees who are alleged to have committed new crimes during their period of insanity commitment." The court reasoned further that a rule to the contrary "would effectively deprive the court of its right—in fact, its obligation— to set conditions of release that are necessary to ensure that the safety of other persons will not be endangered." Moreover, according to the court, such a rule "would mean that an insanity acquittee, regardless of the frequency and seriousness of his . . . new crimes committed during the commitment period, would be free to commit those crimes, confident that he would be ultimately returned to the same facility to be placed, again, among the same staff and same patients that [he allegedly] victimized in the first instance." The court observed that the defendant allegedly committed seven assaults on seven separate people at seven different times.

The trial court further explained that, as authorized by Practice Book § 38-4 (b), it had considered the defendant's history of violence and the risk posed to the physical safety of the staff and other patients at the hospital, and had concluded that financial conditions of release were necessary to ensure their safety. Moreover, the court indicated that it had considered the rights of victims afforded by the state constitution, particularly their right to be protected from an accused.[19] Additionally, the court reasoned that, even if the defendant had a right to psychiatric treatment, it was not an unqualified and inalienable right to a certain type of treatment, and the nature of the treatment afforded to him had to be determined with reference to the management issues that he presented, with his interests weighed against the interests of other patients who also were entitled to treatment. Finally, the court noted that, pursuant to its order, the defendant was to receive psychiatric treatment while in the custody of the Commissioner of Correction, and correction officials remained free to consult with the hospital and the board regarding that treatment. The defendant's appeal to this court followed.

The defendant claims on appeal that the trial court's order setting a monetary bond as a condition of release

and, because he was unable to post that bond, his subsequent transfer to the custody of the Commissioner of Correction were in violation of his constitutional rights, namely, his right to bail under the state constitution and his right to procedural due process under the federal constitution. For the reasons we explain hereinafter, we disagree with each of these claims. We further conclude that the defendant's remedy, if he believes that the mental health treatment he is receiving while in the custody of the Commissioner of Correction is constitutionally inadequate, is through an expedited petition for a writ of habeas corpus challenging the conditions of his confinement.

I

The defendant claims first that the trial court's imposition of a monetary bond as a condition of his release violated his right to bail as guaranteed by article first, § 8, of the constitution of Connecticut. According to the defendant, under the circumstances of this case, the court's setting of a monetary bond pursuant to § 54-64a and Practice Book § 38-4 amounted to impermissible preventive detention. Specifically, the defendant contends, the fundamental purpose of bail is to ensure the subsequent appearance of the accused and not to protect the public from a dangerous accused. The defendant argues that, because, as a confined insanity acquittee, his appearance in court essentially was assured, the court's setting of a monetary bond was not permissible. We do not agree.[20]

We begin with the applicable standard of review. Typically, "[t]he determination of an appropriate pretrial bond is a matter within the sound discretion of the trial court"; (internal quotation marks omitted) *State* v. *McDowell*, 241 Conn. 413, 415, 696 A.2d 977 (1997); and appellate review of an order setting such a bond is limited to consideration of whether the trial court abused its discretion. See id. To the extent the defendant's claim requires us to construe either the meaning or applicability of constitutional or statutory provisions, however, our review is plenary. See, e.g., *Rodriguez* v. *Testa*, 296 Conn. 1, 7, 993 A.2d 955 (2010). Additionally, we conduct our review of the defendant's claim that § 54-64a was unconstitutionally applied to him "mindful that legislative enactments carry with them a strong presumption of constitutionality . . . . Consequently, a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 876, 792 A.2d 774 (2002).

Article first, § 8, of the constitution of Connecticut guarantees certain rights to an accused person in "all criminal prosecutions," including the right "to be released on bail upon sufficient security, except in capi-

tal offenses, where the proof is evident or the presumption great . . . ." This court has interpreted the constitutional bail provision strictly, concluding that, "in all cases, even capital cases not falling within the [stated] exception, bail in a reasonable amount should be ordered." *State* v. *Menillo*, 159 Conn. 264, 269, 268 A.2d 667 (1970); see also *State* v. *Ayala*, 222 Conn. 331, 342–43, 610 A.2d 1162 (1992) ("[a criminal] defendant has a fundamental constitutional right to bail pending trial in all [cases] but [those involving] certain capital offenses").

Although we indicated in *Menillo* that the primary purpose of bail is to secure an accused person's presence at trial; *State* v. *Menillo*, supra, 159 Conn. 269; we later acknowledged, after reviewing Connecticut's unique constitutional history, the additional customary purpose of ensuring a defendant's good behavior during the pretrial period. See *State* v. *Ayala*, supra, 222 Conn. 350–51; cf. *State* v. *Bates*, 140 Conn. 326, 330, 99 A.2d 133 (1953) (" '[u]pon admission to bail,' " accused remains within constructive custody of law).[21]

As we explained in *Ayala*, Connecticut's constitutional bail provision, which first appeared in the constitution of 1818 in substantially similar form,[22] has deep roots in our preconstitutional history.[23] See *State* v. *Ayala*, supra, 222 Conn. 349–50. A right to bail provision first appeared in a 1672 legislative enactment and, by 1750, was included in our statutory declaration of rights, where it remained until the creation of a constitutional declaration of rights in article first of the 1818 constitution.[24] See id., 350–51. The preconstitutional provision declared that "no man's person shall be restrained, or imprisoned, by any authority whatsoever, before the law hath sentenced him thereunto, if he can and will give sufficient security, bail, or mainprize for his appearance *and good behaviour in the mean time*, unless it be for capital crimes, contempt in open court, or in such cases wherein some express law doth allow of, or order the same." (Emphasis added.) Public Statute Laws of the State of Connecticut (1808) tit. I, § 4, p. 24. Neither the 1818 constitution nor any subsequent constitution made any express reference to either appearance or good behavior as a purpose of bail. *State* v. *Ayala*, supra, 350–51. As we observed in *Ayala*, however, there is "no evidence . . . that the framers of the 1818 constitution intended to abandon the customary purposes of bail that were in effect at the time of the adoption of the constitution and had been for at least 145 years"; id., 351; particularly because the 1818 constitution was intended to enshrine rights already in existence by virtue of statute and the common law. See id.

In *Ayala*, we also reviewed Connecticut's bail statutes following the enactment of the 1818 constitution and noted that they initially, like the new constitutional provision, were silent as to the purposes of bail. See id.;

see also Public Statute Laws of the State of Connecticut (1839) tit. XX, c. I, § 126, p. 173; Public Statute Laws of the State of Connecticut (1821) tit. 22, § 97, p. 171. In 1849, however, language was added to provide that bail was conditioned on a defendant's appearance in court, and that language remained in the statutes thereafter. *State* v. *Ayala*, supra, 222 Conn. 351;[25] see Revised Statutes of the State of Connecticut (1849) tit. VI, c. XII, § 163, pp. 259–60. We then referred to the addition to the General Statutes of nonfinancial conditions of release in 1981 and concluded that the use of those conditions, "in addition to or in lieu of bond," had "broadened the focus of the purposes of bail to recognize, once again, that bail is a method for ensuring a defendant's good behavior while on release," as well as a method of securing his appearance in court. *State* v. *Ayala*, supra, 351.

Further research into Connecticut's statutory history provides additional support for the notion that the imposition of a bond for the purpose of ensuring public safety is a constitutionally sound practice. Specifically, both prior to and following the adoption of the 1818 constitution, justices of the peace were statutorily authorized to require persons accused of certain disruptive or violent behaviors to provide sureties of "the peace and good behavior," and to imprison those who failed to provide the ordered security. Public Statute Laws of the State of Connecticut (1821) tit. 21, § 36, pp. 147–48; see also Public Statute Laws of the State of Connecticut (1808) tit. CXXV, c. I, §§ 4–6, pp. 545–46.[26] The historical notes to the 1808 provision indicate that statutory authority for sureties of the peace and good behavior has existed since 1698. Public Statute Laws of the State of Connecticut (1808) tit. CXXV, c. I, §§ 4 and 5, p. 546 nn.4 and 5; see also *Sturges* v. *Sherwood*, 15 Conn. 149, 151 (1942). This court has explained that the "proceedings authorized [under these statutory provisions] were intended to prevent the commission of a crime anticipated, rather than to punish a crime committed." *Sturges* v. *Sherwood*, supra, 151. Provisions for sureties of the peace and good behavior were carried forward in each subsequent revision of the General Statutes, and, in fact, statutory authority for a trial court to order them exists today. See General Statutes § 54-56f.[27] The presence of statutes authorizing sureties of the peace and good behavior both prior to, and since, the adoption of the 1818 constitution, along with statutes authorizing bail to ensure a defendant's appearance, clearly establishes that both purposes are constitutionally acceptable reasons for a court to require financial security from an accused individual.[28]

Consistent with these dual purposes, bail reform measures were undertaken in 1990 and resulted in the amendment of statutes governing bail and pretrial release. Specifically, § 54-64a was amended to require

trial courts, when setting nonfinancial and financial conditions of release for individuals charged with most felonies, to consider "what conditions of release will reasonably assure the appearance of the arrested person in court *and* that the safety of any other person will not be endangered . . . ." (Emphasis added.) Public Acts 1990, No. 90-213, § 51 (P.A. 90-213), codified as amended at General Statutes (Rev. to 1991) § 54-64a (b) (2). As part of the same public act, the legislature added § 54-64f, which, in certain cases, provides for the revocation of an accused's pretrial release if there is an adequate showing that he or she has violated the conditions previously imposed "*and* that the safety of any other person is endangered while the [accused] is on release . . . ." (Emphasis added.) P.A. 90-213, § 53, codified at General Statutes (Rev. to 1991) § 54-64f (b).[29]

In *State* v. *Ayala*, supra, 222 Conn. 331, after concluding that bail in Connecticut historically had served dual purposes; see id., 349–53; we upheld the application of § 54-64f against a challenge under article first, § 8, by a defendant whose pretrial release had been revoked upon his arrest for the commission of new, violent crimes. See id., 333–35, 353. We reasoned, additionally, that the defendant's constitutional right to bail had not been infringed because he initially had been released on bail, although he ultimately, by virtue of his more recent criminal behavior, had forfeited his right to be released.[30] Id., 348–49.

In light of the foregoing, we conclude that the defendant's constitutional challenge must fail. To begin, the defendant was not actually denied bail but, rather, was unable to post the bail that the trial court, in its discretion, properly set. Accordingly, as in *Ayala*, the defendant in this case was afforded the opportunity for release that constitutionally was required.[31] Although the defendant suggests that the amount of bail that the trial court set was unreasonable due to his indigence, it is established that "a reasonable amount [of bail] is not necessarily an amount within the power of an accused to raise" but, rather, an amount that is reasonable under all of the relevant circumstances.[32] *State* v. *Menillo*, supra, 159 Conn. 269. Additionally, when setting bail, the trial court properly considered the factors set forth in § 54-64a (b) (2) and how those factors bore on the issue of the danger that the defendant posed to other persons. In other words, the court correctly considered the need to ensure the safety of others, regardless of whether the defendant was a potential flight risk. The defendant was charged with a felony in connection with his alleged assault of and harm to a health-care worker after recently accruing a string of misdemeanor and felony charges for similar conduct directed at multiple victims on multiple occasions, over a period of time spanning less than one year. Pursuant to the statutory directive, and consistent with *Ayala*, the court concluded that "[t]he nature and circumstances of

the offense"; General Statutes § 54-64a (b) (2) (A); "the number and seriousness of charges pending against the [defendant]"; General Statutes § 54-64a (b) (2) (H); and "the [defendant's] history of violence"; General Statutes § 54-64a (b) (2) (J); suggested that he continued to pose a serious risk to the safety of staff and patients at the hospital, particularly the victims of the assaults for which he had been charged, who constitutionally were entitled to be protected from him. See Conn. Const., amend. XXIX (victim of crime has "the right to be reasonably protected from the accused throughout the criminal justice process"). Accordingly, the trial court acted within its discretion in requiring a substantial monetary bond as a condition of the defendant's release.

In sum, the trial court properly set a monetary bond as a condition of the defendant's release as a means to ensure the safety of other persons. We conclude, therefore, that the trial court did not deny the defendant his right to bail under article first, § 8, of the constitution of Connecticut. We now turn to the defendant's remaining claim on appeal.

## II

In his initial brief to this court, the defendant claimed that his transfer from the hospital to prison, that is, from the jurisdiction of the board to the custody of the Commissioner of Correction, violated his rights to both substantive and procedural due process.[33] According to the defendant, he had certain treatment rights by virtue of his status as an insanity acquittee, and by virtue of certain statutes, regulations and case law governing such persons, and he wrongfully was deprived of those rights as a result of his transfer to the custody of the Commissioner of Correction after his alleged commission of additional crimes and his failure to post bond. The defendant contended further that the transfer was effected without appropriate procedural safeguards, because no explicit statutory mechanism or jurisprudential guidance exists to govern the transfer of an insanity acquittee to a correctional facility on the ground that he poses a danger to others. He suggested that, at a minimum, a full evidentiary hearing is necessary, at which there could be consideration of his treatment rights and the hospital's ability to house him safely. In his reply brief and at oral argument, however, the defendant conceded that the treatment rights to which he had referred were not absolute,[34] and he clarified that his challenge was to the procedures that had been employed to deprive him of those rights. Accordingly, we consider his substantive due process claim to be abandoned. With respect to the defendant's procedural due process claim, the state contends that the defendant has not established any constitutional violation because, while represented by counsel, he had multiple hearings, including a bond hearing at which

the relevant factors were considered, and expedited appellate review, which he pursued, and there were other procedures available to him through which he could have contested the necessity of his detention but did not. We agree with the state.[35]

We begin with the well settled general principles governing a procedural due process claim. "[F]or more than [one] century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard . . . . Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . Instead, due process is a flexible principle that calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) *Barros* v. *Barros*, 309 Conn. 499, 507–508, 72 A.3d 367 (2013). For this reason, a due process analysis is "inherently fact-bound" and focused on the particular circumstances of the case at hand. (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 523, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

"Due process analysis begins with the identification of the life, liberty or property interest at stake." *State* v. *Campbell*, 224 Conn. 168, 181, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993). In order to prevail on a fourteenth amendment procedural due process claim based on the deprivation of a liberty interest, a party must establish: "(1) [a] liberty interest [that] falls within the protection of the due process clause; (2) [that] he has been deprived of that interest; and (3) [that] the deprivation has occurred without due process of law." Id., 182.

The liberty interest that the defendant claims derives from provisions of Connecticut statutes governing insanity acquittees and the hospitalization of mentally ill persons. Specifically, the defendant cites his right to be treated at the hospital, a maximum security psychiatric facility, as a result of his acquittal by reason of mental disease or defect and the board's subsequent determinations; see General Statutes § 17a-561 ("[t]he Whiting Forensic Division of the Connecticut Valley Hospital shall exist for the care and treatment of [inter alia, (1)] patients with psychiatric disabilities, confined in facilities under the control of the Department of Mental Health and Addiction Services, who require care and treatment under maximum security conditions"); and the statutory bill of rights for psychiatric patients (patient bill of rights); see General Statutes §§ 17a-540 through 17a-550; which we have held is not applicable to inmates receiving mental health services in correctional institutions.[36] *Wiseman* v. *Armstrong*, 269 Conn. 802, 812, 850 A.2d 114 (2004). But cf. id., 824 (indicating that §§ 17a-540 through 17a-550 nevertheless would be applicable to patients receiving treatment in facilities

such as "Whiting Forensic Division of the Connecticut Valley Hospital").

It is well established that "[l]iberty interests protected by the [f]ourteenth [a]mendment may arise from two sources—the [d]ue [p]rocess [c]lause itself and the laws of the [s]tates." (Internal quotation marks omitted.) *State* v. *B.B.*, 300 Conn. 748, 752, 17 A.3d 30 (2011). Even when there is no inherent constitutional guarantee to a particular right, "[o]nce a state provides its citizens with certain statutory rights beyond those secured by the constitution itself, the constitution forbids the state from depriving individuals of those statutory rights without due process of law." (Internal quotation marks omitted.) Id., 753. We agree that, given the defendant's status as an insanity acquittee and the determinations of the board that followed his acquittal, the statutory provisions he has cited create a right to, or justifiable expectation in, his treatment at the hospital and certain protections regarding the contours of that treatment that may not be available to him during his temporary period of pretrial detention. Accordingly, he has stated a cognizable liberty interest, of which he cannot be deprived without due process of law.[37] See, e.g., id., 754–55; see also *Vitek* v. *Jones*, 445 U.S. 480, 488–89, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) ("[o]nce a [s]tate has granted . . . a liberty interest [via statute] . . . due process protections are necessary to [e]nsure that the state-created right is not arbitrarily abrogated" [internal quotation marks omitted]).

Once a protected liberty interest is identified, we must determine the nature and extent of the process that is due. "Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures. . . . All that is necessary is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard . . . to [e]nsure that they are given a meaningful opportunity to present their case. . . . Under this analysis, the court must consider three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 236 Conn. 561, 571–72, 674 A.2d 416 (1996); accord *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 349, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

We begin with the first *Mathews* factor, namely, the private interest of the defendant that was affected by the trial court's order. The provisions of the patient bill

of rights, which do not apply to the defendant during his period of pretrial incarceration, are significant.[38] They include not just the protection of a patient's "personal, property [and] civil rights"; General Statutes § 17a-541; rights to communicate by mail and telephone and to receive visitors; General Statutes §§ 17a-546 and 17a-547; and qualified rights to refuse the administration of medication and certain treatment; General Statutes § 17a-543; but also include a positive, "meaningful right to treatment, consistent with the requirements of good medical practice," in other words, "not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a specialized treatment plan as expressly mandated by [General Statutes § 17a-542]." (Internal quotation marks omitted.) *Mahoney* v. *Lensink*, 213 Conn. 548, 565, 569 A.2d 518 (1990). In contrast, the medical and psychiatric treatment rights of a pretrial detainee housed in a correctional facility generally are governed by federal constitutional standards that bar correction officials from demonstrating "deliberate indifference" to a detainee's "serious medical condition . . . ."[39] *Caiozzo* v. *Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). Additionally, however, there is a statutory requirement that the Department of Correction provide a person such as the defendant, who has been diagnosed with a mental illness by a psychiatrist and deemed a danger to himself or others, with "individualized, clinically appropriate and culturally competent mental health services to treat such [person's] condition." General Statutes § 18-96a (a).[40]

In light of the existence of this liberty interest, we turn next to the question of what process was due to the defendant before he could be deprived of that interest. Under the second *Mathews* factor, we consider the risk that an unwarranted transfer of the defendant to the custody of the Commissioner of Correction occurred under the procedures that were used, and the probable value, if any, of additional or alternative safeguards. See *State* v. *Patterson*, supra, 236 Conn. 572. Specifically, we consider whether the defendant had an adequate opportunity to contest his transfer as unnecessary, or whether additional procedures might have enhanced the accuracy of the court's determination that imposition of a bond was warranted to protect the safety of others at the hospital.

We first examine the procedures used. The defendant had ample notice that the state intended to seek a bond, which potentially could cause him to be transferred, on the basis of the danger that he posed to the hospital staff and patients, specifically, because of his repeated, assaultive conduct at the hospital. This is because, in the months preceding the trial court's August 25, 2014 order setting a bond, the parties vigorously litigated the issue of whether, under the circumstances of the case, the court possessed the authority to do so. After the defendant had been arraigned on multiple charges in

connection with multiple incidents at the hospital, the state filed a motion for bond review, pursuant to which it sought to have a bond imposed in connection with the new offenses, and the defendant filed two lengthy memoranda of law in response. Along with these filings, a great deal of evidence concerning the defendant's psychiatric condition and his violent propensities was submitted to the court in exhibits, much of it presented by the defendant. That evidence included (1) a report prepared by the hospital and three reports prepared by the defendant's independent psychiatric evaluator in connection with the defendant's prior acquittal by reason of mental disease or defect,[41] (2) a transcript of the commitment hearing before the court, *McMahon, J.*, at which two physicians from the hospital and the defendant's independent evaluator had testified, (3) a transcript of the defendant's subsequent commitment hearing before the board, at which the same witnesses testified,[42] and (4) the board's memorandum of decision recommending the defendant's commitment to the hospital.[43] On June 18, 2014, the trial court held a hearing on the state's motion for bond review, at which the defendant was represented by two public defenders who were permitted to present argument.[44]

A bond hearing was held on August 25, 2014, after the defendant was charged with new, violent offenses. At that hearing, the defendant again was represented by a public defender. Defense counsel explained to the court the circumstances of the defendant's most recent offenses and argued that he should remain at the hospital. The court noted the defendant's multiple existing cases involving his assaults of people at the hospital and observed that the hospital's repeated willingness to accept the defendant back after these incidents undercut an assertion, made previously by defense counsel, that hospital staff could accommodate the defendant but was experiencing "sour grapes" due to Judge McMahon's rejection of the hospital's earlier recommendation that the defendant be returned to prison. After noting that the charged felony had resulted in injuries to a staff member, the court imposed the bond at issue, which resulted in the defendant's transfer to the custody of the Commissioner of Correction.

Following the court's setting of a bond, the defendant moved to stay its imposition pending appeal. In connection with that motion, the defendant submitted another lengthy memorandum of law and additional evidence to the court. Specifically, he submitted his treatment records from the hospital and those postdating his transfer. Hearings were held on the defendant's motion to stay on September 11 and 24, 2014. At those hearings, two public defenders appeared for the defendant and were permitted to present extensive argument.

On September 3, 2014, the defendant, while represented by a public defender, filed a bail review petition

with the Appellate Court. He attached to that petition most, if not all, of the material that he previously had presented to the trial court.

Considering the extensive procedures that were employed, we conclude that the chance of an erroneous decision, namely, one involving the failure to give due consideration to the defendant's treatment rights and the deprivation of those rights by the setting of a bond and his subsequent removal from the hospital when that course of action was unnecessary, was minimal. Prior to the decision that ultimately resulted in his transfer, the defendant had multiple hearings, was represented by one or more competent counsel at all times and was permitted to present whatever argument and evidence he believed was pertinent. Accordingly, the trial court was fully aware of the defendant's status as an insanity acquittee, his mental health history, his position that he should remain at the hospital for treatment and his contention that he was being treated unfairly by being singled out for prosecution. The court was equally aware of the defendant's violent behavior and the harm that he already had caused to others. Pursuant to § 54-64a, the trial court's task, in view of the fact that the defendant had been charged with a new felony, was to determine the *least restrictive* condition of release that would ensure his future appearance and "that the safety of any other person [would] not be endangered . . . ." General Statutes § 54-64a (b) (2). The very focus of the court's inquiry, therefore, was on whether the defendant safely could be released to the hospital again on a promise to appear, or whether permitting him to remain there, without further conditions, would create an unacceptable risk of danger to others. In making this determination, the court, pursuant to the statutory directive, was required to consider a broad array of factors, including the defendant's mental health, the charges pending against him, the strength of the evidence supporting those charges, the defendant's history of violence and previous convictions, and the likelihood that he would commit another crime if released. See General Statutes § 54-64a (b) (2).

Also pursuant to statutory directive, the court was required to state the basis of its decision on the record; see General Statutes § 54-64a (b) (3); and the defendant possessed an immediate right to review of that decision by the Appellate Court. General Statutes § 54-63g. The trial court further explicated its reasoning in response to the defendant's motion to stay at yet another hearing, and our rules of practice afforded the defendant immediate review, by this court, of the trial court's denial of the stay. See Practice Book § 66-6. In sum, the procedures actually employed contained most if not all of the standard hallmarks of due process.[45] See, e.g., *Wilkinson* v. *Austin*, 545 U.S. 209, 226–27, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005) (explaining that fair notice and opportunity for response are among most important

procedural mechanisms for avoiding erroneous deprivations of liberty interests, that multiple levels of review further reduce chances of erroneous deprivations and that requiring decision maker to provide statement of reasons for decision guards against arbitrariness).

The defendant contends that a more extensive, more adversarial hearing, perhaps with a greater burden on the state, was necessary and would have lessened the chance of an unnecessary loss of his treatment rights. Although we doubt that this is the case, we note that, under existing statutory procedures, the defendant had an additional avenue available to him that he did not pursue, one that could have afforded him a full evidentiary hearing. Specifically, at any time following his transfer, the defendant could have filed a motion to modify the conditions of his release pursuant to General Statutes § 54-69 (a). In accordance with that provision, whenever any accused person believes that the amount of a bond imposed is excessive in relation to its purpose, he may apply to the trial court and receive a hearing at which he has the opportunity to prove such excessiveness. See General Statutes § 54-69 (a). If the trial court agrees, it is authorized to modify the bond and/ or impose different conditions of release. See General Statutes § 54-69 (a). Consequently, if the defendant had any evidence that the hospital could house him in a way that ensured the safety of others but, for whatever reason, was refusing to do so, he clearly had the opportunity to present that evidence to the court.

Finally, under the third *Mathews* factor, we consider the state's interest, including any burdens that the imposition of additional procedural requirements would entail. *State* v. *Patterson*, supra, 236 Conn. 572. As a general matter, the state's interest in protecting its citizens is well established and is particularly acute in the case of institutionalized individuals in its custody, who are entitled to the same treatment as the defendant, in addition to being safe and secure. See, e.g., *Youngberg* v. *Romeo ex rel. Romeo*, 457 U.S. 307, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (involuntarily committed persons have "constitutionally protected interests in conditions of reasonable care and safety"); cf. *Wilkinson* v. *Austin*, supra, 545 U.S. 227 (in prison context, "[t]he [s]tate's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves"). Moreover, the state has a constitutional obligation to protect crime victims from accused persons. See Conn. Const., amend. XXIX. At the time of the defendant's transfer from the hospital to the custody of the Commissioner of Correction, he stood accused of multiple, violent crimes against other patients and staff at the hospital. All of the incidents underlying the charges against the defendant had occurred within a relatively short period of time and had commenced shortly after his arrival at the hospital. See footnote 11 of this opinion. Furthermore, at the

time of the incident that resulted in the final charges against the defendant and the court's imposition of a bond, a second hearing on the state's previous motion for bond review had been scheduled and then postponed at the defendant's request. These circumstances suggest that any delay attendant to the imposition of additional procedural requirements or placement of a higher evidentiary burden on the state would create a substantial risk of additional injuries to innocent persons.

A balance of the three relevant factors leads us to conclude that the procedures employed before the defendant was transferred from the hospital to the custody of the Commissioner of Correction were adequate and that the defendant was not deprived of procedural due process. We are not persuaded that any benefits that might have accrued from additional procedural requirements justify a conclusion that those requirements were constitutionally required. In fact, the palpable risk of harm to third parties counsels against them.

The only case of which we are aware that involves a similar factual pattern lends further support to our conclusion. In *Romero* v. *Schauer*, 386 F. Supp. 851 (D. Colo. 1974), the United States District Court for the District of Colorado evaluated the constitutionality of the procedures employed to transfer patients confined at a "[s]tate [h]ospital" to a state penitentiary, pursuant to a statute that authorized such a transfer when a patient is "so dangerous that he cannot be safely confined in any institution for the care and treatment of the mentally ill . . . ." (Internal quotation marks omitted.) Id., 854, quoting Colo. Rev. Stat. § 71-2-4 (3) (Cum. Supp. 1967). One of the patients whose transfer was at issue was committed as a result of a civil proceeding, whereas the other, like the defendant in the present case, was an insanity acquittee. *Romero* v. *Schauer*, supra, 853. The court concluded that the existing procedures, which were highly informal and conducted entirely by hospital personnel, violated the patients' due process rights; id., 855–56; and mandated a more formal procedure requiring that a potential transferee receive the assistance of counsel, notice of the basis of the allegations of dangerousness, a hearing before an impartial decision maker, a qualified opportunity to present witnesses and documentary evidence, and a written statement by the decision maker explaining the evidence relied on and the reasons for the transfer decision. Id., 858, 862.

*Romero* is not truly on point in that the patients subject to transfer, unlike the defendant in the present case, had not been charged with committing multiple, violent crimes against other patients and staff while institutionalized. See id., 857. Moreover, the transfers at issue in *Romero* were not, by their nature, limited in duration; see id.; as is the defendant's temporary

period of pretrial detention. Because of those differences, it is safe to conclude that less vigorous procedural protections than those afforded to the patients in *Romero* would suffice in the present case. Nevertheless, as we previously noted, the protections that the defendant received essentially were commensurate with those held to be constitutionally required in *Romero*. In sum, the defendant received all of the process that was required, and likely more.

As a final matter, we reemphasize that the defendant, although temporarily in the custody of the Commissioner of Correction, still possesses a right to some level of psychiatric treatment, even if that treatment is less than that to which he has become accustomed during his time at the hospital. See footnotes 35 and 36 of this opinion. Contrary to the defendant's suggestion, there is nothing in the record to indicate that he is not receiving the care to which he, as a pretrial detainee, is entitled. If, however, at any time, the defendant believes that the treatment he is receiving is inadequate, he may pursue an expedited petition for a writ of habeas corpus challenging the conditions of his confinement. See, e.g., *Jolley* v. *Commissioner of Correction*, 98 Conn. App. 597, 597–98, 910 A.2d 982 (2006), cert. denied, 282 Conn. 904, 920 A.2d 308 (2007).

The order imposing a monetary bond as a condition of the defendant's release is affirmed.

In this opinion EVELEIGH, ESPINOSA and ROBINSON, Js., concurred.

[1] General Statutes § 52-265a, which allows for expedited, interlocutory appeals when certain, special circumstances are shown to exist, provides in relevant part: "(a) Notwithstanding the provisions of sections 52-264 and 52-265 [governing appeals and writs of error], any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the Chief Justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a special session of the Supreme Court for the purpose of an immediate hearing upon the appeal. . . ."

Subsequent to the Chief Justice's granting of the defendant's application to appeal pursuant to § 52-265a, we granted the petitions of the Office of Protection and Advocacy for Persons with Disabilities and the National Crime Victim Law Institute to appear as amici curiae.

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great . . . ."

[3] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[4] With the exception of a five day period, the defendant had been incarcerated in correctional facilities from age seventeen to age thirty-five. He spent approximately the next three years in either an inpatient hospital setting

or the community, then was reincarcerated in 2007. He remained incarcerated until the occurrence of the events described hereinafter.

[5] At the time of the incident, the defendant was serving a sentence for an earlier conviction for assault of a correction officer.

[6] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

[7] General Statutes § 17a-582 provides in relevant part: "(a) When any person charged with an offense is found not guilty by reason of mental disease or defect pursuant to section 53a-13, the court shall order such acquittee committed to the custody of the Commissioner of Mental Health and Addiction Services who shall cause such acquittee to be confined, pending an order of the court pursuant to subsection (e) of this section, in any of the state hospitals for psychiatric disabilities . . . .

"(b) Not later than sixty days after the order of commitment pursuant to subsection (a) of this section, the superintendent of such hospital . . . shall cause the acquittee to be examined and file a report of the examination with the court, and shall send a copy thereof to the state's attorney and counsel for the acquittee, setting forth the superintendent's . . . findings and conclusions as to whether the acquittee is a person who should be discharged. . . ."

[8] Pursuant to § 17a-582 (c), following receipt of the hospital's report, counsel for the acquittee may seek a separate examination of the acquittee by a psychologist or psychiatrist of the acquittee's choice, and any resulting report from such examination must be filed with the trial court within thirty days of the filing of the hospital's report.

[9] Pursuant to § 17a-582 (d), the trial court, after receiving the results of a hospital evaluation conducted pursuant to § 17a-582 (b) and, if the acquittee requests it, a separate evaluation conducted by a psychologist or psychiatrist of the acquittee's choice pursuant to § 17a-582 (c), must conduct a hearing. After that hearing, the court may find that the acquittee should be either discharged, conditionally released or confined. See General Statutes § 17a-582 (e) (1) and (2). "If the court finds that the acquittee is a person who should be confined . . . the court shall order the acquittee committed to the jurisdiction of the board and . . . confined in a hospital for psychiatric disabilities . . . for custody, care and treatment pending a hearing before the board pursuant to section 17a-583; provided (A) the court shall fix a maximum term of commitment, not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense . . . ." General Statutes § 17a-582 (e) (1).

[10] Pursuant to § 17a-583 (a), "[t]he board shall conduct a hearing to review the status of [an insanity] acquittee within ninety days of an order committing the acquittee to the jurisdiction of the board," and, pursuant to § 17a-583 (b), at that hearing, "the board shall make a finding and act pursuant to section 17a-584."

General Statutes § 17a-584 directs the board, at the hearing held pursuant to § 17a-583 (a), to "make a finding as to the mental condition of the acquittee . . . considering that its primary concern is the protection of society . . . ." It further authorizes the board to find that the acquittee either should be discharged, conditionally released or confined. See General Statutes § 17a-584 (1) through (3). "If the board finds that the acquittee is a person who should be confined, the board shall order the person confined in a hospital for psychiatric disabilities . . . for custody, care and treatment." General Statutes § 17a-584 (3).

General Statutes § 17a-599 provides in relevant part that, "[a]t any time the court or the board determines that the acquittee is a person who should be confined, it shall make a further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security. . . ." Pursuant to General Statutes § 17a-561, "[t]he Whiting Forensic Division of the Connecticut Valley Hospital shall exist for the care and treatment of [inter alia] (1) patients with psychiatric disabilities, confined in facilities under the control of the Department of Mental Health and Addiction Services, who require care and treatment under maximum security conditions . . . ."

[11] The record indicates that, as a result of incidents occurring on five separate dates, the defendant was charged with a total of eleven misdemeanors, including one count of unlawful restraint in the second degree, three

counts of assault in the third degree, two counts of threatening in the second degree, one count of criminal mischief in the third degree, three counts of disorderly conduct and one count of breach of the peace in the second degree.

Moreover, the hospital's October 23, 2013 report indicates that, between August 24, 2013, and October 1, 2013, while the defendant was being evaluated by the hospital, he engaged in an additional five unprovoked physical altercations with other patients, as well as other verbal altercations with both patients and hospital staff. None of these incidents resulted in any criminal charges against the defendant.

[12] As to the charge of threatening in the second degree, the trial court, *Gold, J.*, imposed a $1000 nonsurety bond.

[13] Hereinafter, all references to the trial court are to the court, *Gold, J.*, unless otherwise noted.

[14] General Statutes § 54-64a provides in relevant part: "(b) (1) When any arrested person charged with the commission of [a felony, with certain listed exceptions] . . . is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, (D) upon such person's execution of a bond with surety in no greater amount than necessary. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

"(2) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, and (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released.

"(3) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (2) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that it imposed. . . ."

[15] The provisions of Practice Book § 38-4 are similar to those of General Statutes § 54-64a (b).

[16] The Commissioner of Correction thereafter directed that the defendant be confined at Northern Correctional Institution.

[17] Prior to filing his appeal with this court, the defendant filed a petition for bail review with the Appellate Court pursuant to Practice Book § 78a-1. The Appellate Court granted the defendant's petition but denied the relief requested therein.

[18] At this hearing, the trial court denied the defendant's request for either an automatic or a discretionary stay, and the defendant thereafter filed with this court a motion for review of the trial court's order. See Practice Book §§ 61-13, 61-14 and 66-6. We granted the motion for review but denied the relief requested therein.

[19] Article first, § 8, of the constitution of Connecticut, as amended by article seventeen and twenty-nine of the amendments, provides in relevant part: "In all criminal prosecutions, a victim . . . shall have . . . the right to be reasonably protected from the accused throughout the criminal justice

process . . . ."

[20] The defendant also argues that public policy reasons should exempt him from the imposition of a monetary bond and consequent incarceration for his inability to post that bond because, by virtue of his status as an insanity acquittee, he is mentally ill and requires treatment at the hospital. As we discuss more fully in part II of this opinion, there are competing public policy objectives that require a balancing of the interests of the defendant, the state and crime victims. In the end, the temporary incarceration of the defendant, while not a perfect solution, best serves the interests of *all* of the affected parties.

[21] As we subsequently observed, a bail bond "constitutes a contract that can be forfeited, not only upon the defendant's failure to appear, *but also upon breach of other conditions in the agreement.*" (Emphasis added.) *State* v. *Garvin*, 242 Conn. 296, 305, 699 A.2d 921 (1997); see also *United States* v. *Gigante*, 85 F.3d 83, 85 (2d Cir. 1996) (approving bail condition requiring forfeiture of bail collateral if defendant committed new crime during release).

[22] See Conn. Const. (1818), art. I, § 14 ("[a]ll prisoners shall, before conviction, be bailable by sufficient sureties, except for capital offences, where the proof is evident, or the presumption great").

[23] In determining the meaning of provisions in our state constitution, we have considered, among other things, the language of their historical antecedents. See, e.g., *State* v. *Lamme*, 216 Conn. 172, 178–79, 579 A.2d 484 (1990).

[24] Although the state's preconstitutional declaration of rights was statutory in form, it was "treated by both the legislature and the people as standing above ordinary statutes. The [d]eclaration and supplementary statutes relating to individual rights were grounded in the Connecticut common law and viewed as inviolate." (Footnote omitted.) C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982).

[25] *Ayala* mistakenly identifies the year in which such language first appears as 1949, rather than 1849. See *State* v. *Ayala*, supra 222 Conn. 351; see also Revised Statutes of the State of Connecticut (1849) tit. VI, c. XII, § 163, pp. 259–60.

[26] Contemporaneous case law illustrates the use of sureties of the peace to ensure good behavior and to protect public safety. See *Sturges* v. *Sherwood*, 15 Conn. 149, 149 (1842) (preliminary statement of facts and procedural history) (defendant, who had assaulted complainant and then threatened to harm him, was required to post $750 bond); *Darling* v. *Hubbell*, 9 Conn. 350, 351 (1832) (preliminary statement of facts and procedural history) (defendant, who was accused of maintaining house of bawdry and ill fame, was required to post $40 bond).

[27] General Statutes § 54-56f provides in relevant part: "Any judge of the Superior Court may, from his personal knowledge or upon complaint of another, require *sureties of the peace and good behavior* from any person who threatens to beat or kill another or resists or abuses any officer in the execution of his office or contends with angry words or, by any unlawful act, terrifies or disturbs any person. When any person complains on oath to a judge of the Superior Court that he has just cause to fear that another will imprison, beat or kill the complainant, or procure others to do so, and that he is under fear of bodily harm, such judge may, if he believes such person has just cause for such fear, require sureties of the peace and good behavior from the person so complained of. Upon refusal of the person so required to find sureties of the peace in any of such cases, such judge may commit him to a community correctional center to remain until he is discharged by due course of law or until the next term of the superior court having criminal jurisdiction in such judicial district, which may make further order relating to the subject matter of any such offense . . . ." (Emphasis added.)

[28] The dissent does not acknowledge the long-standing existence in Connecticut of statutory provisions authorizing sureties of the peace and good behavior until nearly the conclusion of a lengthy analysis that relies heavily on dicta and case law from other jurisdictions. According to the dissent, these provisions are not relevant because they are not part of the criminal law, and our constitutional bail provision applies only to criminal prosecutions. That assertion is belied by (1) the inclusion of General Statutes § 54-56f in title 54 of the General Statutes, which governs criminal procedure, and in chapter 960 of the General Statutes, which addresses information, procedure and bail, and (2) the directive of § 54-56f to commit one who fails to provide surety to a community correctional center until legally

discharged or "until the next term of the superior court having *criminal jurisdiction* . . . ." (Emphasis added.) Moreover, pursuant to § 54-64a (c) (4), a court imposing conditions of release on an arrested person is explicitly authorized to order that person to provide a surety of the peace pursuant to § 54-56f. Finally, as the dissent acknowledges, this court has described surety of the peace statutes as "criminal in . . . nature." *In re Bion*, 59 Conn. 372, 383, 20 A. 662 (1890). *In re Bion* was a habeas action brought after the petitioner was jailed for failing to provide a surety of the peace in connection with a criminal matter. See id., 372, 374 (preliminary statement of facts and procedural history). In that case, the surety at issue was conditioned on *both* the petitioner's future appearance before the court and the requirement "that in the meantime he keep the peace and be of good behavior to all the citizens of the state, and especially [toward] the . . . [complainant] . . . ." Id., 374 (preliminary statement of facts and procedural history). In an aside, the decision references the constitutional bail provision and notes that, in that case, the "bail" was challenged as "excessive" and subsequently reduced. Id., 389; see also id., 375 (preliminary statement of facts and procedural history). The foregoing demonstrates that Connecticut's statutes governing bail and sureties of the peace are not truly separate and apart, as the dissent suggests, with constitutional strictures applying to one but not the other.

The dissent contends variously that "there is no indication in either the pre-1818 or post-1818 statutes that courts were authorized to set a monetary bond to protect the public from a defendant perceived to pose a safety risk," that "for more than 150 years after the adoption of the 1818 constitution, no Connecticut statute authorized a court to consider public safety in determining whether to release a defendant on bail until the current language was added [to § 54-64a] in 1990," and that, "[t]hroughout the history of Connecticut jurisprudence, there is not a single case in which a Connecticut court has indicated that a monetary bond may be set in a criminal case for the purpose of protecting public safety." In light of the consistent, unbroken inclusion of provisions authorizing sureties of the peace and good behavior in Connecticut's statutes from 1698 until today, and case law evidencing their usage; see footnote 26 of this opinion; the dissent's repeated assertions to the contrary are inaccurate.

Finally, even if, as the dissent contends, sureties of the peace truly are creatures distinct from bonds for appearance, the distinction would do little to advance the defendant's claim. It would be irrational to conclude that a court constitutionally is authorized to detain, for the inability to provide financial security, an individual not charged with any crime, who poses a threat to a particular person, but not to detain, for the inability to provide financial security, a person who has been charged with a felony and likely poses a danger to the general public. If the constitution permits the former, it necessarily must permit the latter, even if, for a time, the statutes governing bail did not explicitly contemplate consideration of the risk that a defendant would pose a danger to others.

[29] I agree with the dissent that the trial court could have elected to revoke the defendant's release in an earlier case pursuant to § 54-64f. That, however, is not the issue before us.

[30] Approximately five years before this court decided *Ayala*, the United States Supreme Court held that protecting the public from particularly dangerous individuals, pursuant to the federal Bail Reform Act of 1984 (act), 18 U.S.C. § 1341 et seq., was a constitutionally permissible reason for the outright pretrial detention, without the possibility of bail, of certain accused individuals. See *United States* v. *Salerno*, 481 U.S. 739, 753–55, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). Unlike article first, § 8, however, the eighth amendment to the United States constitution does not explicitly provide for a right to bail but only provides that "[e]xcessive bail shall not be required . . . ." U.S. Const., amend. VIII. In *Salerno*, the United States Supreme Court confirmed, as a preliminary matter, that the eighth amendment does not confer an absolute right to bail but guarantees only that, if bail is imposed, it cannot be excessive. *United States* v. *Salerno*, supra, 754.

[31] Because the trial court set a bond, much of the authority on which the defendant relies, which involves state constitutional provisions similar to Connecticut's, is readily distinguishable or otherwise does not support his claim. See *Martin* v. *State*, 517 P.2d 1389, 1390–91, 1397–98 (Alaska 1974) (finding unconstitutional preventive detention as to one appellant, who had been refused bail entirely, but not as to other two appellants, and, of those two, one was detained after *conviction* because he had violated his probation and other was held when nonfinancial condition of pretrial release was not

met); *In re Underwood*, 9 Cal. 3d 345, 346–47, 508 P.2d 721, 107 Cal. Rptr. 401 (1973) (concluding that trial court's complete denial of petitioner's opportunity to post bail on ground that he posed danger to community violated his constitutional right to bail); *State* v. *Pray*, 133 Vt. 537, 542, 346 A.2d 227 (1975) (holding that complete denial of bail to defendants on ground that they posed danger to public was unconstitutional); see also *Rendel* v. *Mummert*, 106 Ariz. 233, 238–39, 474 P.2d 824 (1970) (upholding revocation of bail for petitioner's commission of new offenses, in comparison to "outright [pretrial] detention, [for which] no bail is allowed in the first instance"); *Mello* v. *Superior Court*, 117 R.I. 578, 581–85, 370 A.2d 1262 (1977) (upholding revocation of bail for defendant's commission of new crimes while on pretrial release, reasoning, in part, that defendant had not been denied bail in first instance, as constitutionally required).

The defendant further relies on *United States* v. *Melendez-Carrion*, 790 F.2d 984, 988, 1004 (2d Cir.), cert. dismissed, 479 U.S. 978, 107 S. Ct. 562, 93 L. Ed. 2d 568 (1986), for the proposition that safeguarding the community from a dangerous person is a constitutionally impermissible justification for pretrial preventive detention. He contends that, consistent with the historical analysis embraced by that decision, trial courts setting conditions of release should not consider public safety in general, but only whether the accused is likely to disrupt the trial process by intimidating or injuring witnesses or jurors. The reasoning of *Melendez-Carrion* was rejected, however, by the United States Supreme Court in *Salerno*. See *United States* v. *Salerno*, 481 U.S. 739, 748–51, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). Additionally, the defendant's contention is belied by the factual context of *State* v. *Ayala*, supra, 222 Conn. 331, against which the holding of that case must be read. In *Ayala*, the defendant's release was revoked not for intimidating or injuring a witness or juror but for the commission of a new and unrelated assault on a stranger. See id., 336.

[32] The dissent articulates its belief that the state constitution does not permit preventive detention. While preventive detention is permitted in certain instances in the federal system, I agree that it is not permitted under our state constitution except in capital cases. The bond in this matter was set at $100,000. Notably, the defendant has not asserted a claim under the eighth amendment to the United States constitution or the portion of article first, § 8, prohibiting the imposition of "excessive bail . . . ." Moreover, if the defendant believes that the amount of the bond that the trial court set was more than necessary to ensure public safety, he may, at any time, file a motion to modify the conditions of his release pursuant to General Statutes § 54-69 (a).

[33] The due process clause of the fourteenth amendment to the United States constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law . . . ." The United States Supreme Court has held that the due process clause "protects individuals against two types of government action. So-called substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty . . . . When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . . This requirement has traditionally been referred to as procedural due process." (Citations omitted; internal quotation marks omitted.) *United States* v. *Salerno*, 481 U.S. 739, 746, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

[34] See General Statutes § 17a-599 ("[a]ny acquittee found so violent as to require confinement under conditions of maximum security shall not be confined in any hospital for psychiatric disabilities . . . unless such hospital . . . has the trained and equipped staff, facilities or security to accommodate such acquittee").

[35] As an additional basis for his procedural due process claim, the defendant argues that he had a liberty interest in avoiding transfer from the hospital to Northern Correctional Institution (Northern), a maximum security facility, because that transfer constituted " 'a major change in his conditions of confinement amounting to a grievous loss,' " and he wrongfully was deprived of that interest without due process. The defendant cites, among other cases, *Wilkinson* v. *Austin*, 545 U.S. 209, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), in support of his argument. According to the defendant, the detrimental effects of such a facility on a mentally ill individual are a necessary consideration in any transfer decision, such that procedural safeguards are required. We decline to consider this argument because it is unsupported by any competent evidence in the record regarding the actual conditions

of confinement to which the defendant, a pretrial detainee, is subject at Northern, and how they differ from the conditions to which he was subject at the hospital. Compare *Scarver* v. *Litscher*, 434 F.3d 972, 973–74 (7th Cir. 2006) (relying on factual findings regarding facility conditions made during preliminary injunction hearing held by District Court), with *Romero* v. *Schauer*, 386 F. Supp. 851, 855 and n.5 (D. Colo. 1974) (making factual findings based on testimony concerning differences between facilities). We disagree with the defendant that we appropriately may consider this issue by relying on law review articles, or on factual findings from extra-jurisdictional cases concerning the conditions at different correctional facilities at different points in time. This court repeatedly has drawn the distinction between the proper use of extra-record materials, such as social science texts or journal articles, as "legislative facts . . . which help determine the content of law and policy, and adjudicative facts . . . concerning the parties and events of a particular case. . . . Legislative facts may be judicially noticed [on appeal] without affording the parties an opportunity to be heard, but adjudicative facts, at least if central to the case, may not." (Citation omitted; internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 478–79, 102 A.3d 52 (2014).

For similar reasons, we cannot rely on most of the material cited by the Office of Protection and Advocacy for Persons with Disabilities in its amicus brief, much of which purports to describe conditions in the most restrictive level of the administrative segregation unit at Northern. Notably, there is no evidence to indicate that the defendant, a pretrial detainee, has been placed in this unit. Rather, the records of the Department of Correction that defense counsel submitted to the trial court in connection with the defendant's motion to stay indicated that, upon admission to Northern, the defendant was assigned to the general population with full privileges.

[36] The defendant also mentions the right to be overseen by the board, citing various provisions of the statutes governing that body; see General Statutes §§ 17a-582, 17a-592 and 17a-599; and jurisprudence discussing the board's function and expertise. We do not consider this claimed right as a part of our due process analysis, however, because it is not clear from the record that the defendant, although temporarily in the physical custody of the Commissioner of Correction, has been deprived of board oversight. See, e.g., *State* v. *Campbell*, supra, 224 Conn. 182 (requiring showing of deprivation of claimed liberty interest to establish due process violation); see also *State* v. *Lindo*, 110 Conn. App. 418, 424, 955 A.2d 576 (inmate at correctional institution remained under jurisdiction of board for purposes of recommitment hearing), cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008). We note in this regard that insanity acquittees who are eligible for conditional release or temporary leave from confinement, and who therefore are not housed in a psychiatric hospital in the physical custody of the Commissioner of Mental Health and Addiction Services, nevertheless remain under the jurisdiction of the board. See generally General Statutes §§ 17a-584 through 17a-591. Moreover, as the trial court observed in denying the defendant's motion for stay, officials at Northern Correctional Institution are free to consult with the board regarding the defendant's treatment.

[37] The United States Supreme Court has held that involuntarily committed individuals "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg* v. *Romeo ex rel. Romeo*, 457 U.S. 307, 322, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982); see also id., 321–24 (examining rights of involuntarily committed mentally retarded persons). Specifically, such individuals enjoy "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required [to effectuate] these interests." Id., 324. Because Connecticut statutes provide a higher level of protection to involuntarily committed insanity acquittees, we analyze the defendant's due process claim with reference to those provisions.

We further emphasize that the right of the defendant, as an insanity acquittee, to be free from punishment does not truly differentiate him from any other pretrial detainee who has not yet been convicted of a crime. See *Bell* v. *Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("under the [d]ue [p]rocess [c]lause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). It is established that pretrial detention, although undoubtedly a significant restriction on liberty, does not constitute punishment but, rather, permissible government regulation of the pretrial process. See id., 536–37; see also *United States* v. *Salerno*, supra, 481 U.S. 747.

[38] We pause to observe that, however significant the benefits at issue may be to the defendant, they necessarily constitute a less significant liberty interest than that at issue in a typical bond hearing, namely, the interest in full and unrestricted freedom from confinement. The defendant, as an insanity acquittee confined at a maximum security psychiatric facility, already had had his liberty sharply curtailed. Cf. *Wilkinson* v. *Austin*, 545 U.S. 209, 225, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005) ("[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled [before being transferred to a facility with more restrictive conditions of confinement] are more limited than in cases [in which] the right at stake is the right to be free from confinement at all"); *In re Steven M.*, 264 Conn. 747, 763, 826 A.2d 156 (2003) ("a juvenile who already has been adjudicated delinquent and is in the custody of the state does not possess the same liberty interest as a juvenile who faces delinquency proceedings"). Furthermore, the liberty interest that the defendant is seeking to enforce through this appeal essentially is one, the United States Supreme Court has held, that an incarcerated prisoner has an interest in *avoiding*. See *Vitek* v. *Jones*, supra, 445 U.S. 492–93 (involuntary transfer of prisoner to state mental hospital implicates liberty interest and requires procedural safeguards because "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement," due to adverse social consequences, stigma and potential for compelled treatment).

[39] As the United States Court of Appeals for the Eleventh Circuit has explained, "[d]eliberate indifference to a [pretrial detainee's] serious medical needs" violates the due process clause of the fourteenth amendment. *Goebert* v. *Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007); see id. (explaining that standards that govern prisoner's cruel and unusual punishment claim under eighth amendment govern pretrial detainee's claim under due process clause of fourteenth amendment). "To show deliberate indifference, the detainee must show that: (1) [he] had a serious medical need; (2) the prison official acted with deliberate indifference to that serious medical need; and (3) the prison official's deliberate indifference caused the detainee injury." *Blanchard* v. *White County Detention Center Staff*, 262 Fed. Appx. 959, 963 (11th Cir. 2008). "To show deliberate indifference, the subjective component of the claim, the [detainee] must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." (Internal quotation marks omitted.) Id. When a claim "turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is minimally adequate." (Internal quotation marks omitted.) Id., 964.

The deliberate indifference standard shapes the contours of a detainee's right to psychological or psychiatric care, just as it does the right to other types of medical treatment. See *Inmates of Allegheny City Jail* v. *Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). "The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances." (Footnote omitted.) Id.

[40] General Statutes § 18-96a (a) provides in relevant part: "When assessing and subsequently providing mental health services to any inmate confined in a correctional facility of the Department of Correction who has been diagnosed with a mental illness by a psychiatrist . . . and such psychiatrist has informed the department that such inmate is currently diagnosed by such psychiatrist to be a danger to himself . . . or others, the department shall consider the diagnosis of such psychiatrist in order to appropriately assess such inmate and provide individualized, clinically appropriate and culturally competent mental health services to treat such inmate's condition."

An array of mental health services are provided to inmates at Connecticut's correctional institutions through Correctional Managed Health Care, a unit of the University of Connecticut Health Center whose mental health department is comprised of "approximately 14 [p]sychiatrists, 13 [p]sychologists, 10 mental health [n]urse [p]ractitioners, 17 psychiatric [n]urse [c]linicians, 74 [s]ocial [w]orkers, and 20 [p]rofessional [c]ounselors [who] serve the needs of approximately 19.2 percent of the inmate population, about [3300] unique individuals." UConn Health, Correctional Managed Health Care, available at http://cmhc.uchc.edu/programs_services/index.html (last visited October 20, 2015).

[41] The hospital's report spans twenty-eight pages, is single spaced, and

details extensively the defendant's lengthy history of violence and psychiatric diagnoses and treatment.

[42] These transcripts detail the defendant's violent behavior while at the hospital for evaluation and the injuries that he had caused to patients and staff.

[43] The board's memorandum of decision indicates that, following the defendant's arrival at the hospital, his conduct necessitated four transfers to different units.

[44] At the hearing, the trial court indicated that it had read the psychiatric reports attached to the parties' filings.

[45] According to one constitutional law treatise, the essential elements of due process, outside of the criminal trial context, are the following: "(1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; [and] (7) a decision based on the record with a statement of reasons for the decision." 3 R. Rotunda & J. Nowak, Treatise on Constitutional Law: Substance and Procedure (5th Ed. 2012) § 17.8 (a), p. 128.

---